UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRENDA MENDEZ, | No. 1:19-cv-00073-GSA |
| Plaintiff, | |
| v. | **ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF PLAINTIFF AND AGAINST COMMISSIONER OF SOCIAL SECURITY** |
| ANDREW SAUL, Commissioner of Social Security, | |
| Defendant. | |

## I.      Introduction

Plaintiff Brenda Mendez ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for supplemental security income pursuant to Title XVI of the Social Security Act.  The matter is currently before the Court on the parties' briefs which were submitted without oral argument to the Honorable Gary S. Austin, United States Magistrate Judge.[1]  *See* Docs. 13, 14 and 15.  Having reviewed the record as a whole, the Court finds that the ALJ's decision is not supported by substantial evidence and applicable law.

///

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge.  *See* Docs. 7 and 8.

## II.   Procedural Background

On September 23, 2014, Plaintiff filed an application for supplemental security income alleging disability beginning February 26, 2014.  AR 19.  The Commissioner denied the application initially on May 18, 2015 and on reconsideration on November 20, 2015.  AR 19.

On December 14, 2015, Plaintiff filed a request for a hearing before an Administrative Law Judge.  AR 19.  Administrative Law Judge Joyce Frost-Wolf presided over an administrative hearing on September 13, 2017.  AR 19, 33-60.  Plaintiff appeared and was represented by an attorney.  AR 33.  On January 3, 2018, the ALJ denied Plaintiff's application.  AR 19-28.

The Appeals Council denied review on November 13, 2018.  AR 1-4.  On January 16, 2019, Plaintiff filed a complaint in this Court.  Doc. 1.

## III.   Factual Background

### A.   Plaintiff's Testimony

#### 1.  Agency Hearing

Plaintiff (born April 11, 1985) lived with her two children, aged six and thirteen.  AR 39. Plaintiff's mother lived nearby and came over to help Plaintiff about three times weekly.  AR 43. Plaintiff's mother took care of tasks that were painful for Plaintiff such as driving the children to school, doing dishes and mopping.  AR 47.

Most of the time Plaintiff was able to prepare her family's meals, but she needed to rest if the preparation time exceeded thirty or forty minutes.  AR 43.  She could still do her own grocery shopping as long as her children were available to unload the car when Plaintiff returned home. AR 45.

Plaintiff briefly pursued vocational training at Heald College but was unable to finish.  AR 40.  She worked three days as a packer and about a month and a half as a part-time field worker. AR 40.  She never worked full time.  AR 41.

The ALJ observed Plaintiff repeatedly adjusted her position in her chair and asked whether Plaintiff was uncomfortable.  AR 43.  Plaintiff explained that she had not slept well, had a thirty-minute car ride to the hearing and now was sitting.  AR 44.  Both sitting and riding a distance in the car were painful.  AR 44.  Plaintiff was unable to stand or sit for too long a period.

2

AR 44.  In the course of a typical day, Plaintiff alternated sitting and standing with lying down.
AR 44-45.  Plaintiff estimated that she lay down a total of four to six hours a day.  AR 45.
Mornings, especially if the weather was cold or rainy, were the most painful time and Plaintiff
sometimes stayed in bed late on such mornings.  AR 45.  About three times weekly Plaintiff
experienced headaches which were sometimes accompanied by dizziness, sweating and
shakiness.  AR 50.

Plaintiff was taking four medications and receiving epidurals for her back pain, which
ranged from three to eight on a scale of ten.  AR 41.  The medications were not sufficient to
relieve Plaintiff's pain for a full day and they made her dizzy and sleepy.  AR 42.  She
experienced more pain on the days she exerted herself.  AR 43.  Taking her children to school or
going to an appointment caused the most severe pain.  AR 46-47.

Plaintiff had used Fentanyl patches for her pain until her doctor said that he had prescribed
the medication improperly and Plaintiff had become addicted.  AR 49.  Plaintiff testified that in
any event, the patches had not fully relieved her pain and had produced more side effects than the
pain medications she was then using.  AR 49.

**2.  Adult Function Report**

In an exertion report completed in January 2015, Plaintiff reported that her mother had
recently moved into Plaintiff's home.  AR 218.  Because Plaintiff's pain had increased, her
mother was driving the children to school and doing the household chores.  AR 218.  It hurt to
bend and Plaintiff could carry no more than ten pounds.  AR 219.  Plaintiff experienced pain after
twenty minutes of activity.  AR 220.  She took fentanyl, ibuprofen and Norco; sometimes wore a
brace; and, used a TENS unit daily.  AR 220.

**B.    Third-Party Evidence**

In November 2014, an agency interviewer observed that Plaintiff had obvious spinal
curvature and pain when walking, standing or sitting.  AR 216.

///

///

///

C.      **Medical Records**

Plaintiff has severe congenital scoliosis (spinal curvature).  When Plaintiff was seventeen years old (2002), she had scoliosis surgery that relieved her pain for several years.  By 2013, however, Plaintiff's pain was increasing.

From December 2013 through April 2017, Robert G. Fernandez, M.D., treated Plaintiff for severe chronic back pain at Adventist Medical Center—Reedley.  AR 278-305, 331-47, 353-76, 416-34, 446-95, 510-61, 563-72, 628-42.  Dr. Fernandez characterized Plaintiff's pain as difficult to control and noted typical pain of 8/10.  He prescribed ibuprofen, Norco and Fentanyl for pain relief.  On March 10, 2015, Dr. Fernandez observed uneven gait, tenderness along Plaintiff's spine, severe decreased range of motion and muscle spasms.  AR 451.

On November 7, 2014, Plaintiff underwent magnetic resonance imaging of her lumbar and thoracic spine.  AR 306-09.  Reviewing the thoracic images, John Dalle, O.D., identified (1) significant idiopathic dextroscoliosis of the thoracic spine with compensatory levoscoliosis of the lumbar spine; (2) postoperative changes related to metallic vertical rod fixation; (3) no evidence for thoracic spinal cord contusion or myelomalacia of the visualized thoracic cord; (4) no segmentation fusion anomaly of the thoracic spine; (5) no significant disc bulge or herniation; and, (6) cholelithiasis (a gall stone).  AR 307.  Seyed Emamian, M.D., reviewed the lumbar images.  AR 308-09.  He observed:

> Low-lying conus medullaris at L3 associated with mildly thickened fatty filum terminate consistent with tethering (? the cause of patient's scoliosis).  Consider surgical consult, if the patient has not had prior surgery for cord tethering release.  Also noted low positioning of the tip of the thecal sac as described associated with a small cyst; consider high resolution CI of sacrum/coccyx including lumbosacral junction to delineate the bony anatomy.

AR 309.[2]

_____

[2] Tethered cord syndrome is a rare neurological condition, the severity of which varies from person to person. Symptoms may be apparent at birth or may not produce symptoms until later in life.  The condition may result in foot and spinal abnormalities, weakness of the legs, loss of feeling in the lower extremities, lower back pain, scoliosis and urinary incontinence.  Tethered cord syndrome occurs when tissue attachments limit the movement of the spinal cord within the spinal column.  The syndrome may result from improper growth of the neural tube during fetal development, which is closely linked to spina bifida.  Other potential causes including narrowing of the spinal column with age, spinal cord injury, tumors and infection.  Treatment varies based on the signs and symptoms present in the particular patient and the severity of the condition but may include surgery and medications to manage pain.  www.rarediseases.info.nih.gov/diseases/4018/tethered-cord-syndrome (accessed December 11, 2019).

Dr. Emamian also observed lower lumbar facet joint degenerative changes but no significant discogenic disease, canal or foraminal stenoses in the visualized lumbar spine. AR 309. Neither doctor could visualize the portions of Plaintiff's spine masked by the metallic fusion rods. AR 306, 308.

Anna Miller, M.D., reviewed a CT scan of Plaintiff's lumbar spine performed December 24, 2014. AR 324-35. Dr. Miller observed (1) mild acquired canal stenosis at L1 probably related in part to Plaintiff's earlier Harrington rod[3] surgery; (2) spina bifida occulta at S1 with spina bifida at S2 and S3 segments;[4] and, (3) moderately severe rotary scoliosis of the lumbar spine. AR 325.

On March 30, 2015, Christopher P. Ames, M.D., and Tiffany Pong, PA, examined Plaintiff at the University of California San Francisco Medical Center ("UCSF"). AR 396. Plaintiff reported pain described as 9/10 along her entire spine and radiating into her shoulders. AR 396. Plaintiff's pain was worse when staying in one position for prolonged time periods and better when laying down. AR 399. She had shaking of her upper and lower extremities bilaterally. AR 396. In addition to back, neck and joint pain, Plaintiff's reported symptoms included chills, weight loss, diaphoresis, blurred vision, shortness of breath, heartburn, nausea, vomiting, abdominal pain, diarrhea, constipation, urinary urgency, dizziness, tingling tremors, speech change, weakness, allergies, depression, memory problems, anxiety and insomnia. AR 397.

Physical examination revealed "[o]bvious scoliosis, right shoulder sits above left shoulder, With flexion, prominent right rib hump." AR 398. Thoracic lumbar range of motion was 25 per cent limited in all planes, with pain on extension and side-bending. AR 398. Plaintiff was able to ambulate normally and to heel, toe and tandem walk without difficulty. AR 398.

---

[3] Harrington instrumentation, commonly referred to as a Harrington rod, is a system of hooks and metal rods inserted into the posterior elements of the spine to provide distraction and compression in treatment of scoliosis and other spinal deformities. Dorland's Illustrated Medical Dictionary at 846 (28th ed. 1994).
[4] Spina bifida is a defect that occurs when the neural tube in a developing fetus does not close as it should, resulting in malformation of the spinal column and mild to severe damage to the spinal cord and nerves. The severity of the resulting disability depends on the size and location on the spinal cord, and the extent of damage to the spinal cord or nerves. Spina bifida occulta, sometimes called hidden spina bifida, consists of a small opening in the spine without an opening or sac on the infant's back. Spina bifida occulta frequently results in no damage to the spine or nerves. www.cdc.gov/ncbddd/spinabifida/facts.html (accessed December 16, 2019).

Imaging studies revealed intact instrumentation and hardware from T1/2 to T11/12. AR 398. Thoracic dextroscoliosis was 61 degrees; lumbar compensatory scoliosis was 31 degrees. AR 398. Plaintiff had good balance in the sagittal plane. AR 398. She had fatty filum tethered cord. AR 398, 402.

On April 6, 2015, Dr. Ames ordered CT scanning, urodynamic testing for tethered cord, and facet block injections at T11-L2 and T1-T3. AR 436-40. Dr. Ames also referred Plaintiff for pain management to wean her narcotic addiction. AR 438.

Drs. Cynthia T. Chin, M.D., and David Landry, M.D., performed a neuro-interpretation of Plaintiff's scoliosis imaging, using 2006 and 2014 images for comparison. AR 402. They observed no significant change in the prominent dextroscoliosis of Plaintiff's thoracic spine, centered at T6 and no significant sagittal coronal imbalance. AR 403. Diffuse generalized osteopenia[5] limited the sensitivity of the examination. AR 403. Plaintiff's prominent scoliosis also impaired examination of individual vertebrae. AR 403. Plaintiff's Harrington instrumentation was intact. AR 403. Spina bifida occulta at S1 was unchanged. AR 403. Flexion and extension views of the cervical, thoracic and lumbar spines did not show instability. AR 403.

After examining Plaintiff on August 21, 2015, Dr. Fernandez noted that Plaintiff was experiencing "severe incapacitating pain which is not even controlled with fentanyl, Norco and ibuprofen." AR 518. Plaintiff was unable to be weaned off of her pain medications "due to her severe pathology." AR 518. Plaintiff had developed difficulties in voiding her bladder. AR 518. She continued to demonstrate abnormal gait and posture, severe spinal deformity, asymmetry of spinal muscles, diffuse tenderness, decreased range of motion, muscular spasm and uneven hip heights. AR 519.

Malcolm Arthur Whitaker, M.D., evaluated CT imaging of Plaintiff's lumbar spine performed on August 31, 2015. AR 532-33. He observed (1) the presence of Harrington rods;
///

[5] Osteopenia is a term to define bone density that is not normal but is not as low as osteoporosis. www.ncbi.nlm.nih.gov/pubmed/21234807 (accessed December 16, 2019).

(2) no evident osseous abnormality; (3) multilevel osseous foraminal stenosis without evidence central canal stenosis; and, (4) bibasilar lung atelectasis.[6]  AR 532.

From June 2016 through August 2017, Plaintiff received pain management services at LAGS Spine and Sportscare.  AR 573-620, 624-27, 643-48.  LAGS providers characterized Plaintiff's primary impairments to be right lumbar radiculopathy and lumbar spondylolisthesis.  Medical records indicate abnormal gait and lumbar range of motion.  On January 1, 2017, Frederick Comrie, M.D., reported normal results from a bilateral needle EMG and nerve conduction study.  AR 617.  There was no evidence of large fiber peripheral neuropathy or lumbar radiculopathy.  AR 617.  On February 21, 2017, Dr. Comrie administered bilateral lumbar 5 transforaminal epidural injections.  AR 586.  Plaintiff reported that epidural steroid injections successfully relieved her pain.  AR 578.

On June 19, 2016, Hassan B. Semaan, M.D., evaluated x-rays of Plaintiff's lumbar spine.  AR 623.  Dr. Semaan observed general demineralization of the vertebral bodies and multilevel degenerative disc disease with multilevel disc space narrowing.  AR 623.

### D.    Medical Opinions[7]

#### 1.    Agency Physicians

On initial review, neurologist Lydia Kiger, M.D., recommended a light residual functional capacity.  AR 68.  She opined that Plaintiff was able to sit and stand or walk six hours in an eight-hour workday and lift and carry twenty pounds occasionally and ten pounds frequently.  AR 71.  Plaintiff could occasionally climb ramps or stairs, balance, stoop, kneel, crouch and crawl but could never climb ladders, ropes or scaffolds.  AR 71.  Plaintiff should avoid concentrated exposure to unprotected height and heavy machinery, cold and humidity.  AR 72.

///

---

[6] Atelectasis is collapse of lung tissue with loss of volume.  www.merckmanuals.com/professional/pulmonary-disorders/bronchiectasis-and-atelectasis/atelectasis (accessed December 17, 2019).  *See also* Koumboulis, A.C., Scoliosis and the Respiratory System, www.ncbi.nlm.nih.gov/pubmed/16765303 (accessed December 17, 2019) ("Scoliosis impedes the movement of the ribs, places the respiratory muscles at mechanical disadvantage and displaces the various organs of the thoracic cavity.  Scoliosis decreases the chest wall compliance directly and the lung compliance indirectly (due to progressive atelectasis and air-trapping) causing a significant increase in the work of breathing that, because of associated respiratory muscle weakness may lead to chronic respiratory failure.")
[7] Opinions of the agency psychologists and the consultative psychiatric opinion of psychologist Pauline Bonilla, Psy.D., are addressed in section VII below.

On reconsideration, gastroenterologist C. Bullard, M.D., recommended a sedentary residual functional capacity. AR 87. Dr. Bullard opined that Plaintiff could lift ten pounds both occasionally and frequently, could stand or walk four hours in an eight-hour work day, and could sit six hours in an eight-hour workday. AR 87. Dr. Bullard agreed with the postural and environmental limitations recommended by Dr. Kiger. AR 87-88.

### 2. Consultative Orthopedic Examination

On April 25, 2015, orthopedist Dale H. Van Kirk, M.D., performed a comprehensive orthopedic evaluation of Plaintiff. AR 496-500. Dr. Van Kirk observed that Plaintiff could sit comfortably, get up and out of a chair, get on and off the examination table, and walk around the examination room without limping. AR 498. Plaintiff could only squat about half-way down. AR 498. The opinion provides a detailed account of Plaintiff's range of motion but does not explain the results. AR 498-99.

Dr. Van Kirk opined that Plaintiff could lift and carry twenty pounds occasionally and fifteen pounds frequently; stand or walk six hours in an eight-hour work day; and, sit six hours in an eight-hour workday. AR 500. Because of chronic thoracolumbar pain, Plaintiff could only occasionally perform postural activities. AR 500. There were no manipulative limitations. AR 500. Plaintiff should not work in an extremely cold or damp environment. AR 500.

### IV. Standard of Review

Pursuant to 42 U.S.C. §405(g), this court has the authority to review a decision by the Commissioner denying a claimant disability benefits. "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted). Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a scintilla, but less than a preponderance. *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (internal citation omitted). When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v.*

*Social Security Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citations and internal quotation marks omitted).

If the evidence reasonably could support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted). "[T]he court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citations and internal quotation marks omitted).

## V.      The Disability Standard

> To qualify for benefits under the Social Security Act, a plaintiff must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if . . . his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §1382c(a)(3)(B).

To achieve uniformity in the decision-making process, the Commissioner has established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 416.920(a)-(f). The ALJ proceeds through the steps and stops upon reaching a dispositive finding that the claimant is or is not disabled. 20 C.F.R. §§ 416.927, 416.929.

Specifically, the ALJ is required to determine: (1) whether a claimant engaged in substantial gainful activity during the period of alleged disability, (2) whether the claimant had medically determinable "severe impairments," (3) whether these impairments meet or are medically equivalent to one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1, (4) whether the claimant retained the residual functional capacity ("RFC") to perform his past relevant work, and (5) whether the claimant had the ability to perform other jobs existing in significant numbers at the national and regional level. 20 C.F.R. § 416.920(a)-(f).

9

## VI.    Summary of the ALJ's Decision

Administrative Law Judge Frost-Wolf found that Plaintiff had not engaged in substantial gainful activity since the application date of September 22, 2014.  AR 21.  Her severe impairments were congenital scoliosis and degenerative disc disease.  AR 21.  None of the severe impairments met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925, 416.926).  AR 22.

The ALJ concluded that Plaintiff had the residual functional capacity to perform sedentary work as defined in 20 C.F.R. §§ 416.967(a), except that she could lift and carry ten pounds both occasionally and frequently; stand and walk four hours; occasionally climb ramps and stairs but never climb ladders, ropes or scaffolds.  AR 22.  She could occasionally balance, stoop, kneel, crouch, crawl and tolerate exposure to extreme cold and humidity.  AR 22.  Plaintiff could not tolerate exposure to unprotected heights, heavy machines with fast moving part(s) or driving.  AR 22.  She could perform noncomplex routine tasks.  AR 22.  The ALJ made no finding concerning Plaintiff's ability to sit.

Plaintiff had no past relevant work.  AR 26.  The ALJ found that considering Plaintiff's age, education, work experience and residual functional capacity, jobs in the national economy that Plaintiff could perform existed in significant numbers.  AR 27.  Accordingly, the ALJ concluded that Plaintiff was not disabled as defined in the Act.  AR 27.

## VII.    Omission of Mental Impairments at Step Two

Plaintiff contends that the ALJ erred in failing to find that Plaintiff had a severe mental impairment based on Dr. Bonilla's consultative opinion.  The Commissioner counters that the ALJ appropriately characterized Plaintiff's mental health impairments as mild to moderate.  The Court finds that the ALJ erred in failing to categorize Plaintiff's mental health impairments as severe but concludes that the error was harmless.

### A.  Medical Opinions

#### 1.  Agency Psychologists

On initial review, psychologist Kim Morris, Psy.D., noted that although Plaintiff had not alleged a mental health impairment, her medical records indicated that Plaintiff experienced

considerable anxiety and depression secondary to her physical impairments. AR 66. Dr. Morris

recommended a mental status examination (MSE) from a consultative examiner. AR 68. After

completing the psychiatric review technique, however, psychiatrist Annette Brooks-Warren

opined that Plaintiff's mental health impairments were not severe. AR 69-70. On

reconsideration, psychiatrist E. Acquino-Caro, M.D., agreed with Dr. Brooks-Warren. AR 84

### 2. Consultative Opinion

Psychologist Pauline Bonilla, Psy.D., performed a consultative psychiatric examination on

April 19, 2015. AR 406-11. Plaintiff began to experience depression at age ten when she was

frequently taunted and bullied as a result of her back problems. AR 47. Plaintiff continued to

struggle with her physical impairments and deformity, reporting embarrassment, sadness, anger,

decreased motivation and energy, and feelings of hopelessness and helplessness. AR 407. She

took psychotropic medication prescribed by her primary care doctor. AR 407.

Dr. Bonilla diagnosed persistent depressive disorder secondary to medical condition and

adjustment disorder with anxiety. AR 409. She described Plaintiff's symptoms as mild to

moderate and opined that there was a good likelihood that Plaintiff's mental condition would

improve within twelve months. AR 410. Plaintiff had mild impairment of her ability to perform

simple, repetitive tasks; accept instructions from supervisors; interact with coworkers and the

general public; sustain an ordinary routine without special supervision; and, maintain regular

attendance in the workplace. AR 410. Plaintiff was mildly to moderately impaired in her ability

to perform detailed and complex tasks; complete a normal workday/workweek without

interruption from a psychiatric condition; and, deal with stress and change encountered in the

workplace. AR 410. There was minimal to moderate probability of Plaintiff's emotionally

deteriorating in the workplace. AR 411.

### A. The ALJ's Analysis

To determine whether Plaintiff's medically determinable mental impairments (depression,

anxiety and adjustment disorder) constituted a severe impairment singly or in combination at step

two, the ALJ applied the four broad areas of mental function to the evidence of Plaintiff's mental

impairments. AR 21. The ALJ found:

The claimant's mental impairment causes a mild restriction in understanding, remembering, or applying information, concentrating, persisting, or maintaining pace, and adapting or managing oneself, and no limitation in interacting with others. The claimant reports limitation in her activities due to her physical pain. She lives with her children and mother, she does some housework, and she does most of the household cooking. She enjoyed family, reading, and television.

Because the claimant's medically determinable mental impairments cause no more than "mild" limitation in any of the functional areas, they are nonsevere (20 CFR 416.920a(d)(1)).

AR 21-22.

Despite characterizing Plaintiff's mental health problems as nonsevere, at step four the ALJ analyzed the opinions of the agency psychologists and Dr. Bonilla in greater detail. She gave some weight to Dr. Bonilla's opinion and to the opinions of the agency psychologists, noting that although Plaintiff's depression appeared to be mild, Plaintiff's use of strong pain medication warranted restricting her to noncomplex tasks. AR 25, 26.

## B. <u>Applicable Law</u>

At step two, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments. *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987); 20 C.F.R. §416.920(a)(4)(ii). An impairment is a medically determinable physical or mental impairment or combination of physical or mental impairments. 20 C.F.R. § 416.902(f). If a claimant does not have an impairment of combination of impairments which significantly limit the claimant's physical or mental ability to do basic work activities, the Commissioner will find that the claimant does not have a severe impairment. 20 C.F.R. § 416.920(c).

"The step-two inquiry is a de minimus screening device to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996). An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that

has no more than a minimal effect on an individual['s] ability to work." *Id.* at 1290; SSR 85-28. "[T]he severity regulation is to do no 'more than allow the Secretary to deny benefits summarily to those applicants with impairments of a minimal nature which could never prevent a person from working.'" SSR 85-28 (quoting *Baeder v. Heckler*, No. 84-5663 (3d Cir. July 24, 1985)).

Even if an individual impairment is not sufficiently serious to prevent a person from working, an ALJ must consider the combined effect of all of the claimant's impairments on his or her ability to function as well as considering the claimant's subjective symptoms, such as pain or fatigue. *Smolen*, 80 F.3d at 1290. "If such a finding is not clearly established by medical evidence, however, adjudication must continue through the sequential evaluation process." SSR 85-28. The ruling warned:

> Great care should be exercised in applying the not severe impairment concept. If an adjudicator is unable to determine clearly the effect of an impairment or combination of impairments on the individual's abilities to do basic work activities, the sequential evaluation process should not end with the not severe evaluation step. Rather, it should be continued. In such a circumstance, it the impairment does not meet or equal the severity level of the relevant medical listing, sequential evaluation requires that the adjudicator evaluate the individual's ability to do past work, or to do other work based on the consideration of age, education, and prior work experience.

SSR 85-28.

For example, Ms. Smolen suffered from childhood cancer that resulted in the loss of one kidney, loss of part of her left lung, changes in her remaining lung tissue, mild anemia, suppression of bone marrow production, and spinal scoliosis, all of which led to severe fatigue and back pain. *Smolen*, 80 F.3d at 1290. The ALJ found only a single severe impairment, "slight scoliosis," which limited her ability to walk and sit. *Id.* The step two analysis disregarded Ms. Smolen's subjective symptoms when determining severity. *Id.* The Ninth Circuit rejected the step two analysis: "Having found Smolen to suffer from only one "severe" impairment at step two, the ALJ necessarily failed to consider at step five how the combination of her other impairments—and resulting incapacitating fatigue—affected her residual functional capacity to do work." *Id.* at 1291.

Strict application of the legal standards articulated in *Smolen* indicate that the ALJ erred in failing to include Plaintiff's mental health impairments among her severe impairments at step two; however, the error is harmless. After finding that Smolen had only one "severe" impairment at step two, "the ALJ necessarily failed to consider at step five how the combination of her other impairments—and resulting incapacitating fatigue—affected her residual functional capacity to do work." *Smolen*, 80 F.3d at 1291. Here, the ALJ fully considered Plaintiff's mental health impairments and the related medical opinions in the step five analysis of Plaintiff's residual functional capacity. Nothing more was required

## VIII. Reliability of Plaintiff's Testimony

Plaintiff contends that the ALJ erred in concluding that her testimony was inconsistent with objective medical evidence in the record. The Commissioner responds that the ALJ appropriately focused her analysis on the objective medical evidence and not on Plaintiff's subjective allegations. Having reviewed the record as a whole and compared the ALJ's findings of Plaintiff's testimony and medical records, the Court observes little, if any, inconsistency between Plaintiff's testimony and the records of her medical testing and treatment.

An ALJ is responsible for determining credibility, resolving conflicts in medical testimony and resolving ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). His or her findings of fact must be supported by "clear and convincing evidence." *Burrell v. Colvin*, 775 F.3d 1133, 1136-37 (9th Cir. 2014).

To determine whether the ALJ's findings are supported by sufficient evidence a court must consider the record as a whole, weighing both the evidence that supports the ALJ's determination and the evidence against it. *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989). "[A] federal court's review of Social Security determinations is quite limited." *Brown-Hunter v. Colvin*, 806 F.3d 487, 492 (9th Cir. 2015). "For highly fact-intensive individualized determinations like a claimant's entitlement to disability benefits, Congress places a premium upon agency expertise, and, for the sake of uniformity, it is usually better to minimize the opportunity for reviewing courts to substitute their discretion for that of the agency." *Id.* (quoting *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014), quoting *Consolo v.*

*Fed. Mar. Comm'n*, 383 U.S. 607, 621 (1966)) (internal quotation marks omitted). Federal courts should generally "'leave it to the ALJ to determine credibility, resolve conflicts in the testimony, and resolve ambiguities in the record.'" *Brown-Hunter*, 806 F.3d at 492 (quoting *Treichler*, 775 F.3d at 1098). In this case, the ALJ relies on inconsistency between the testimony and objective evidence that is without support in the record as a whole and in the ALJ's own findings.

Social Security Ruling 16-3p applies to disability applications heard by the agency on or after March 28, 2016. Ruling 16-3p eliminated the use of the term "credibility" to emphasize that subjective symptom evaluation is not "an examination of an individual's character" but an endeavor to "determine how symptoms limit ability to perform work-related activities." S.S.R. 16-3p at 1-2.

A claimant's statements of pain or other symptoms are not conclusive evidence of a physical or mental impairment or disability. 42 U.S.C. § 423(d)(5)(A); Soc. Sec. Rul. 16-3p. "An ALJ cannot be required to believe every allegation of [disability], or else disability benefits would be available for the asking, a result plainly contrary to the [Social Security Act]." *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).

An ALJ performs a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible. *See Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014); *Smolen*, 80 F.3d at 1281; S.S.R 16-3p at 3. First, the claimant must produce objective medical evidence of an impairment that could reasonably be expected to produce some degree of the symptom or pain alleged. *Garrison*, 759 F.3d at 1014; *Smolen*, 80 F.3d at 1281-1282. In this case, the first step is satisfied by the ALJ's finding that Plaintiff's "medically determinable impairments could reasonably be expected to produce the alleged symptoms." AR 23. The ALJ did not find Plaintiff to be malingering.

If the claimant satisfies the first step and there is no evidence of malingering, the ALJ must "evaluate the intensity and persistence of [the claimant's] symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities." S.S.R. 16-3p at 2. "[S]ome individuals may experience symptoms differently and may be limited by symptoms to a greater or lesser extent than other individuals with the same medical impairments,

the same objective medical evidence and the same non-medical evidence." S.S.R. 16-3p at 5. In reaching a conclusion, the ALJ must examine the record as a whole, including objective medical evidence; the claimant's representations of the intensity, persistence and limiting effects of his symptoms; statements and other information from medical providers and other third parties; and, any other relevant evidence included in the individual's administrative record. S.S.R. 16-3p at 5. "The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." S.S.R. 16-3p at *10.

Because a "claimant's subjective statements may tell of greater limitations than can medical evidence alone," an "ALJ may not reject the claimant's statements regarding her limitations merely because they are not supported by objective evidence." *Tonapetyan v. Halter*, 242 F.3d 1144, 1147-48 (2001) (quoting *Fair*, 885 F.2d at 602). *See also Bunnell v. Sullivan*, 947 F.2d 341, 345 (9th Cir. 1991) (holding that when there is evidence of an underlying medical impairment, the ALJ may not discredit the claimant's testimony regarding the severity of his symptoms solely because they are unsupported by medical evidence). "Congress clearly meant that so long as the pain is *associated* with a clinically demonstrated impairment, credible pain testimony should contribute to a determination of disability." *Id.* (internal quotation marks and citations omitted).

The law does not require an ALJ simply to ignore inconsistencies between objective medical evidence and a claimant's testimony. "While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of claimant's pain and its disabling effects." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); SSR 16-3p (citing 20 C.F.R. § 404.1529(c)(2)). As part of his or her analysis of the record as a whole, an ALJ properly considers whether the objective medical evidence supports or is consistent with a claimant's pain testimony. *Id.*; 20 C.F.R. §§ 404.1529(c)(4), 416.1529(c)(4) (symptoms are determined to diminish residual functional capacity only to the extent that the alleged functional limitations and

16

restrictions "can reasonably be accepted as consistent with the objective medical evidence and other evidence"). "[O]bjective medical evidence is a useful indicator to help make reasonable conclusions about the intensity and persistence of symptoms, including the effects those symptoms may have on the ability to perform work-related activities." S.S.R. 16-3p at 6. Because objective medical evidence may reveal the intensity, persistence and limiting effects of a claimant's symptoms, an ALJ must consider whether the symptoms reported by a claimant are consistent with medical signs and laboratory findings of record. *Id.* For example, "reduced joint motion, muscle spasm, sensory deficit, and motor disruption illustrate findings that may result from, or be associated with, pain." *Id.*

In this case, the ALJ began her analysis by summarizing Plaintiff's testimony about prescription medications that helped her a "little bit" but were not fully effective and left her sleepy and dizzy. AR 23. The ALJ noted Plaintiff's testimony that her pain ranged from three to seven on a scale of ten, and increased to eight with the stress and activity associated with medical appointments. AR 23. Plaintiff testified that she had been told that she was addicted to Fentanyl, which was not very effective in reducing her pain in any event. AR 23. This testimony was fully consistent with Plaintiff's medical records.

The ALJ next considered Plaintiff's day-to-day activities. Physical activity increased Plaintiff's pain and required her to take frequent breaks when she did chores at home. AR 23. Plaintiff's mother did most of the housework and cooked when Plaintiff was not able to do it. Driving was difficult. AR 23. After activity, Plaintiff rested; she lay down a total of four to six hours in the course of the day. AR 23. Plaintiff was able to care for two minor children, perform some house chores and do most of the cooking. AR 24. The ALJ found Plaintiff's testimony to be inconsistent because "she told one consultative examiner that she had not worked due to pain and another consultative examiner that she had not worked because she was a stay at home mother" AR 24. "The mere fact that a plaintiff has carried on certain daily activities such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability." *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001). A claimant need not be "utterly incapacitated" to be disabled. *Fair*, 885 F.2d at 603.

Finally, the ALJ summarized Plaintiff's medical records, setting forth findings

substantially consistent with Plaintiff's testimony and with the record as a whole:

> The treatment record indicates a history of back pain that has been treated with fentanyl patches, Norco, and NSAIDs for many years. In January 2015, the record noted that the claimant's pain was not controlled with these medications. Her pain also increased with cold weather. The claimant was evaluated at UCSF in March 2015. She reported progressively worsening pain, and examination revealed the right shoulder sat higher than the left shoulder, there was a prominent right rib hump, limited range of motion, and negative straight leg raises. Her provider recommended weaning off narcotic medication and performing facet blocks at T11-12 and T1-3. The claimant tried self-weaning from the fentanyl patch, but reported severe pain using just Norco. Her dosage[s] of fentanyl and Norco were reduced in April 2015. At this time, the claimant's provider gave a trial of Fetzima for depression and pain. Urodynamic testing for a tethered cord was also recommended. The claimant continued to complain of severe incapacitating pain that was uncontrolled with medication, and she exhibited an abnormal gait and posture and decreased range of motion. In November 2015, the claimant was taking Norco and ½ a fentanyl patch. Her depression was well-controlled. She also had some limitation in knee range of motion with laxity and tenderness in the joint. Providers have encouraged stretching and exercise.[8] Providers performed an epidural injection in February 2017. In April 2017, the claimant still had an abnormal gait, limited range of motion, and 4/5 motor strength in the ankle and hip abduction with otherwise normal motor strength. She was taking ibuprofen, naproxen, baclofen, butrans, and Neurontin, and was no longer taking fentanyl or Norco.
>
> An MRI of the thoracic spine in November 2014 showed a significant idiopathic dextroscoliosis of the thoracic spine with compensatory levoscoliosis of the lumbar spine, postoperative changes related to a metallic rod fixation, no evidence of thoracic spinal cord contusion, no segmentation fusion anomaly, and no significant disc bulge/herniation with patent neural foramina, and cholelithiasis. An MRI of the lumbar spine showed low-lying conus medlaris at L3 associated with mildly thickened fatty filum terminale consistent with tethering, and lower lumbar facet joint degenerative changes. A CT of the lumbar spine in December 2014 showed mild acquired canal stenosis at L1 probably related in part to surgery, spina bifida occulta at S1 with S2 and S3 segments, and moderate to severe rotatory scoliosis of the lumbar spine.
>
> A CT scan of the thoracic spine in August 2015 showed long segment Harrington rods placed for extensive/severe right ward thoracic rotoscoliosis, no evidence of acute osseous abnormality, multilevel osseous foraminal stenosis due to rotoscoliosis, no definite osseous central canal stenosis, and bibasilar lung atelectasis. X-rays of the

---

[8] The cited exhibit notes physical therapy to encourage stretching and range of motion exercises. AR 591. Yet no medical provider ever referred Plaintiff for physical therapy.

18

right knee in June 2016 were normal. X-rays of the lumbar spine at that time showed multilevel degenerative changes.

Electrodiagnostic testing in January 2017 was normal with no evidence of polyneuropathy or lumbar radiculopathy.

AR 24-25 (citations to administrative record omitted).

As summarized by the ALJ, the objective medical evidence is substantially consistent with Plaintiff's account of her chronic, severe pain. In other words, the testimony and objective medical records in this case do not fit the Commissioner's oft used language concerning claimant testimony that is inconsistent with objective medical evidence. Therefore, the Court disagrees with the ALJ's conclusion that Plaintiff's testimony was inconsistent with the objective medical evidence of record. To the extent that the determination of Plaintiff's residual functional capacity was based on the ALJ's rejection of Plaintiff's pain testimony, that determination must be reversed and omitted from the residual functional capacity determination on remand.

### IX.    The Residual Functional Capacity Determination Is Incomplete

Plaintiff's challenge to the Commissioner's determination of her residual functional capacity relies primarily on the ALJ's improper rejection of Plaintiff's pain testimony. An additional error exists, however. Despite extensive subjective and objective evidence of Plaintiff's impaired ability to sit, including the ALJ's own observation of Plaintiff's difficulties in sitting in the course of the administrative hearing (AR 43-44), the residual functional capacity determination in the hearing decision is silent on Plaintiff's residual functional capacity to sit.

Courts generally do not address issues not raised by the parties on appeal. F.R.App.P. 28(a); *Crawford v. Gould*, 56 F.3d 1162, 1169 (9th Cir. 1995). Nonetheless, a court may raise an issue *sua sponte* to prevent injustice, *Morales v. Astrue*, 2010 WL 2629571 at *8 (C.D. Cal. June 29, 2010) (No. CV 09-2494-PJW), or to raise an affirmative defense not raised by the defendant, *Tahoe-Sierra Preservation Council, Inc., v. Tahoe Regional Planning Agency*, 216 F.3d 764, 788-89 (9th Cir. 2000), overruled on other grounds, *Gonzales v. Arizona*, 677 F.3d 383, 389 n. 4 (9th Cir. 2012). *Moore v. Astrue*, 2011 WL 1532407 at *3 (D. Mont. Mar. 30, 2011) (No. CV-10-36-GF-SEH-RKS). Failure to address the omission of Plaintiff's residual functional capacity to sit would constitute such an injustice.

19

"Residual functional capacity is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p. The residual functional capacity assessment considers only functional limitations and restrictions which result from an individual's medically determinable impairment or combination of impairments. SSR 96-8p.

A determination of residual functional capacity is not a medical opinion but a legal decision that is expressly reserved for the Commissioner. See 20 C.F.R. §§ 416.927(d)(2) (RFC is not a medical opinion), 416.946(c) (identifying the ALJ as responsible for determining RFC). "[I]t is the responsibility of the ALJ, not the claimant's physician, to determine residual functional capacity." *Vertigan*, 260 F.3d at 1049. In doing so the ALJ must determine credibility, resolve conflicts in medical testimony and resolve evidentiary ambiguities. *Andrews*, 53 F.3d at 1039-40.

"In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record such as medical records, lay evidence and the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment." *Robbins*, 466 F.3d at 883. *See also* 20 C.F.R. § 404.1545(a)(3) (residual functional capacity determined based on all relevant medical and other evidence). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting evidence, stating his interpretation thereof, and making findings." *Magallanes*, 881 F.2d at 751 (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)).

The hearing decision sets forth Plaintiff's residual functional capacity as follows:

> After careful consideration of the entire record. I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) except that she can lift and carry 10 pounds occasionally and 10 pounds frequently, stand and walk four hours, occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds. She can occasionally perform balancing, stooping, kneeling, crouching, and crawling; and can tolerate occasional exposure to extreme cold and humidity, but she cannot tolerate exposure to unprotected heights, heavy machines with fast moving part[s], or driving. Mentally, she can perform noncomplex routine tasks.
>
> AR 22.

The ensuing discussion does not consider Plaintiff's residual ability to sit. Not only does the regulatory definition of sedentary work not resolve the question of a claimant's residual functional capacity to sit, it states a sedentary job is "defined as one which involves sitting." 20 C.F.R. § 416.967(a).

In assessing a claimant's residual functional capacity, the Commissioner must consider all of the claimant's medically determinable impairments, including those that are not severe. 20 C.F.R. § 416.945(a)(2). When a hearing decision provides no indication that an ALJ considered one or more of a claimant's limitations when determining that claimant's residual functional capacity, the ALJ has erred. *Solomon v. Comm' of Soc. Sec. Admin.*, 376 F.Supp.3d 1012, 1021 (D. Ariz. 2019). Failure to consider evidence of all of the claimant's limitations and restrictions is reversible error. *Norris v. Colvin*, 160 F.Supp.3d 1251, 1265 (W.D. Wash 2016); *Palomares v. Astrue*, 887 F.Supp.2d 906, 919 (N.D. Cal. 2012); *Tich Pham v. Astrue*, 695 F.Supp.2d 1027, 1032 (C.D. Cal. 2010);

## X.    Remand for Further Proceedings

When the Commissioner's decision is not supported by substantial evidence, the Court has the authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); *McCartey v. Massanari*, 298 F.3d 1072, 1076 (9th Cir. 2002). "Generally when a court . . . reverses an administrative determination, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.'" *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004); *Moisa v. Barnhart*, 367 F.3d 882, 886 (9th Cir. 2004). Here, remand is appropriate so that the Commissioner may fully consider Plaintiff's residual functional capacity (1) in light of this Court's conclusion that Plaintiff's pain testimony was reliable and consistent with the objective medical evidence of record and (2) with full consideration of the evidence concerning Plaintiff's ability to sit.

## XI.    Conclusion and Order

It is hereby ordered that this case be REVERSED and REMANDED to the Commissioner, pursuant to sentence four of 42 U.S.C. § 405(g), for further proceedings in accordance with this

opinion. The Clerk of Court is directed to enter judgment in favor of Plaintiff, Brenda Mendez, and against Defendant, Andrew Saul, Commissioner of Social Security.

IT IS SO ORDERED.

Dated:    **December 23, 2019**                          **/s/ Gary S. Austin**
                                                    UNITED STATES MAGISTRATE JUDGE